UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD E. CORNS,

        Plaintiff,                              Case No. 4:06-cv-150

v.                                                   HON. JANET T. NEFF

GRAND TRUNK WESTERN
RAILROAD, INC.,

        Defendant.

_____/


## OPINION

Plaintiff, a former yardmaster for defendant, filed this action under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51 – 60, to recover for back injuries sustained in an automobile accident on January 4, 2004, when he allegedly fell asleep while driving home from defendant's Lansing rail yard after working a 16-hour shift. Pending before the Court is defendant's second motion for summary judgment. Defendant previously sought summary judgment on the ground that plaintiff failed to establish an essential element of his claim under the FELA, that is, that he was injured in the scope of his employment. The Court denied defendant's earlier motion in an order entered June 23, 2008 (Dkt 35).

Defendant now moves for summary judgment on three new grounds: (1) there is no evidence of negligence by defendant; (2) plaintiff's negligence claim is inextricably intertwined with the collective bargaining agreement (CBA) and therefore is preempted by the Railway Labor Act (RLA), 45 U.S.C. § 151 *et. seq.*; and (3) plaintiff's claim based on the Hours of Service Act (HSA),

49 U.S.C. §§ 21103 – 21105, fails because plaintiff's duties on the day of his injury do not fall within the HSA. Plaintiff filed a Response (Dkt 56) to the Motion, and defendant filed a Reply (Dkt 57). The Court has also heard oral argument on the motion. For the reasons that follow, the Court denies defendant's motion.

I

Plaintiff was employed as a yardmaster for defendant. His primary work duties as a yardmaster were to lay out the work for the train crews by printing out switch lists and marking them for the cars that need to be switched and to make up a list of the work that needs to be done by the train crews for the next eight (8) to twelve (12) hours (Def. Stmt. Mat. Facts, ¶ 1).[1] The yard crews would come into the yard office before going to work and obtain their work instructions and paperwork from plaintiff. From the confines of the yard office, plaintiff would monitor trains on the main line, trains leaving other terminals, oversee the cars that are being switched, run the computer and switch the cars on the computer, as they were being switched by the crews, as well as handle calls from customers (*id.* ¶ 2).

Sometime near the end of 2002, or the beginning of 2003, plaintiff began working on the "spare board" or "guaranteed extra board" (GEB), on which he would work as a yardmaster at both the Battle Creek and Lansing yard offices (*id.* ¶ 4). Plaintiff would be called to work based strictly on seniority at either the Lansing or Battle Creek yard whenever a vacancy had to be filled, either with someone calling in sick or otherwise absent from work (*id.* ¶ 6).

---

[1] Plaintiff failed to file a corresponding statement of material facts as required under the Court's Information and Guidelines for Civil Practice (Section IV(A)(2)(b)). Accordingly, the Court has relied on defendant's statement in summarizing the relevant facts.

As a yardmaster, plaintiff was a member of the United Transportation Union (UTU), Local 1962 (yardmasters Local), and subject to a separate CBA with defendant governing yardmasters work (*id.* ¶¶ 9, 10). Pursuant to the CBA defendant could call a yardmaster working on the spare board or GEB in to work for two shifts in a row, 16 hours (*id.* ¶ 12). Once a yardmaster on the spare board had worked two shifts, sixteen (16) consecutive hours, however, that yardmaster could not work for at least eight (8) hours, whether he worked in Lansing or Battle Creek (*id.* ¶ 12).

Pursuant to the CBA, a yardmaster working the GEB or spare board was not permitted to work more than two consecutive shifts or more than sixteen (16) hours (*id.* ¶ 15). Further, a yardmaster working the GEB or spare board who had worked sixteen consecutive hours or two shifts would not be required to work for at least eight (8) hours, and at the yardmaster's option, could not be called to work for fourteen (14) hours (*id.* ¶ 16).

On the day of the automobile accident in question, plaintiff worked a double shift of 16 hours. Plaintiff testified to the following work schedule on the days leading up to the accident, from January 1 through the date of the accident, January 4, 2004:

| | | |
|---|---|---|
| Thursday, January 1, 2004 | 0 hours | off work |
| Friday, January 2, 2004 | 8 hours | 3:00 p.m. to 11:00 p.m. |
| Saturday, January 3, 2004 | 8 hours | 7:00 a.m. to 3:00 p.m. |
| Saturday, January 3 to Sunday, January 4, 2004 | 16 hours | 11:00 p.m. to 7:00 a.m. and 7:00 a.m. to 3:00 p.m. |

(Def. Mot. Br. 5; Pl. Resp. 2; Ex. B, Pl. Dep. 98-103.)

After completing his responsibilities at the Lansing yard shortly after 3:00 p.m. on January 4, 2004, plaintiff left for his commute home to Battle Creek, stopping on the way to realign a switch

3

for incoming trains, as instructed by his boss (Def. Mot. Br. 7). After driving about 20 minutes, plaintiff was headed south on Interstate 69 when he allegedly fell asleep at the wheel, lost control of his car, and collided with another vehicle (*id.* at 1). Plaintiff sustained injuries to his back in the accident (*id.*).

On December 15, 2006, plaintiff filed this action under the FELA, seeking damages for his injuries. Plaintiff alleged that defendant forced him to work excessive hours, and that as a result of the excessive work hours, plaintiff suffered from severe sleep deprivation and fatigue, causing him to fall asleep at the wheel of his vehicle (Compl. ¶¶ 7-9). Plaintiff alleged that defendant was negligent on various grounds, including that defendant forced him to work excessive hours in violation of the HSA, 49 U.S.C. §§ 21103 – 21105 (Compl. ¶¶ 7, 10).

II

A motion for summary judgment is properly granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court must construe the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Nickels v. Grand Trunk W. R.R., Inc.,* 560 F.3d 426, 429 (6th Cir. 2009); *Hardyman v. Norfolk & W. Ry. Co.,* 243 F.3d 255, 258 (6th Cir. 2001). The party moving for summary judgment has the burden of showing the absence of evidence in support of some essential element of the opponent's case, on which the opposing party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of a genuine issue for trial. *Id.*

4

III

Defendant first argues that plaintiff's negligence claim under the FELA must be dismissed because there is no evidence of negligence on the part of defendant. Defendant contends that plaintiff cannot demonstrate negligence on defendant's part because defendant merely complied with the work rules set forth in the CBA as to work schedules for yardmasters on the spare board. Although defendant's argument appears to have merit on first review, the Court is persuaded that defendant is not automatically absolved of liability under the FELA based simply on its contractual obligation under the CBA.

The gist of plaintiff's claim is that defendant was negligent in requiring him to work a double-shift of 16 hours on January 4, 2004, which plaintiff alleges was excessive. Defendant points out that requiring plaintiff to work a double shift on January 4, 2004 was in compliance with the express provisions of the CBA, including Art. II, Sec. 8(3)(f), which provides:

> GEB yardmasters who work sixteen (16) consecutive hours (two shifts) will be allowed to book up to fourteen (14) hours of undisturbed rest prior to going back on duty, without affecting their guarantee for that week.

Defendant further points out that plaintiff admitted that he worked 16-hour double shifts approximately once per week for the year prior to the automobile accident and did not complain about it (Def. Mot. Br. 11). Plaintiff testified that about one day out of the week, he went 24 hours without sleep, as he did on the day of his accident (Pl. Dep. 96, 101). Although these circumstances may make a finding of negligence unlikely, they do not render the negligence claim an impossibility.

The FELA was enacted to provide a remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer or coworkers. *Atchison, Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 561 (1987). "The FELA makes a railroad liable to its employees injured 'by

5

reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.'" *Nickels,* 560 F.3d at 429 (quoting 45 U.S.C. § 51). "A primary purpose of the Act was to eliminate a number of traditional defenses to tort liability and to facilitate recovery in meritorious cases. The Act expressly prohibits covered carriers from adopting any regulation, or entering into any contract, to limit their FELA liability." *Buell,* 480 U.S. at 561.

In general, "a FELA plaintiff asserting a cause of negligence against its employer 'must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation.'" *Hardyman,* 243 F.3d at 258 (citations omitted). A railroad's duty under the FELA is to provide a reasonably safe place to work. *Adams v. CSX Trans., Inc.,* 899 F.2d 536, 539 (6th Cir. 1990) "The test is whether the railroad, by failing to exercise reasonable care, participated in a manner to effect or permit an unsafe condition." *Hylinger v. Union Pacific R.R.,* 538 F. Supp. 2d 1325, 1333 (W.D. Wash. 2008).

The elements of a FELA claim are (1) an injury occurred while the plaintiff was working within the scope of his or her employment with the railroad, (2) the employment was in the furtherance of the railroad's interstate transportation business, (3) the employer railroad was negligent, and (4) the employer's negligence played some part in causing the injury for which compensation is sought under the Act. *Hardyman,* 243 F.3d at 258-59.

Defendant contends that compliance with bargained-for work rules does not demonstrate negligence on behalf of defendant or demonstrate a breach of the standard of care owed to plaintiff. Defendant's argument is persuasive, but not conclusive.

Given that plaintiff had worked double-shifts for at least a year without complaint, his negligence claim based simply on having worked a 16-hour shift before the accident seems somewhat incongruous if not disingenuous. Further, the fact that the Union had expressly bargained work rules permitting such shifts may be strong evidence that the work schedule required of plaintiff does not breach the standard of care required of defendant, i.e., does not constitute negligence. Nonetheless, the Court disagrees with defendant that the CBA provision precludes a finding of negligence *as a matter of law*. Defendant cites no authority to establish that mere compliance with a CBA provision is ipso facto reasonable care with respect to a negligence claim under the FELA.

Although the CBA may be relevant evidence concerning whether a duty was breached, it is not determinative of that issue. The FELA "expressly prohibits covered carriers from adopting any regulation, or *entering into any contract*, to limit their FELA liability." *Buell,* 480 U.S. at 561. Thus, defendant cannot rely on the contractual provisions of the CBA to escape liability under the FELA.

IV

Defendant argues that plaintiff's FELA claim must be dismissed because it is preempted by the RLA, since plaintiff's negligence claim is inextricably intertwined with consideration and interpretation of the terms of the CBA. Defendant contends therefore that the National Railroad Adjustment Board has exclusive jurisdiction over plaintiff's claim.

Plaintiff responds that the United States Supreme Court has expressly held that the RLA does not preempt a FELA cause of action, and that the FELA is the proper remedy for employees injured through an employer's negligence. The Court concludes that plaintiff's claim is not preempted in the circumstances presented.

In contrast to the broad remedial purposes of the FELA, the RLA provides a comprehensive framework for the resolution of labor disputes in the railroad industry. *Buell,* 480 U.S. at 562. "[T]he RLA establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of labor disputes. *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252 (1994) (quoting 45 U.S.C. § 151a). The first class, "major disputes," are those that concern "rates of pay, rules or working conditions" relating to "'the formation of collective [bargaining] agreements or efforts to secure them.'" *Id.* (citations omitted). The second class, "minor disputes," "'gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.'" *Id.* at 252-53 (quoting 45 U.S.C. § 151a). "Minor disputes involve 'controversies over the meaning of an existing CBA in a particular fact situation.'" *Id.* at 253. Thus, minor disputes seek to enforce contractual rights. *Id.*

Defendant contends that plaintiff's claim is a "minor dispute" and is therefore subject to compulsory and binding arbitration before the National Railroad Adjustment Board and is within the Board's exclusive jurisdiction. If plaintiff's complaint is determined to constitute a "minor dispute," it is preempted by RLA. *See Hawaiian Airlines,* 512 U.S. at 253.

""The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing [CBA].'" *Hawaiian Airlines,* 512 U.S. at 256 (quoting *Consolidated Rail Corporation (Conrail) v. Railway Labor Executives' Assn.,* 491 U.S. 299, 305 (1989)). Plaintiff's claim is not one which could be conclusively resolved under the CBA.

Further, "[t]he fact that an injury otherwise compensable under the FELA was caused by conduct that may have been subject to arbitration under the RLA does not deprive an employee of his opportunity to bring an FELA action for damages." *Buell,* 480 U.S. at 564. In *Buell*, the Court

8

acknowledged that the RLA has no application to a claim for damages to an employee resulting from the negligence of an employer railroad. *Id.* at 565. Plaintiff here seeks damages alleged to have resulted from the negligence of defendant, as opposed to redress for a right derived from the CBA. Plaintiff's claim is not one of enforcement related to the CBA, and is therefore not properly considered a minor dispute subject to mandatory arbitration.

Defendant cites two FELA cases as directly on point and thus mandating a result in favor of defendant on the RLA preemption issue in this case, *Monroe v. Missouri Pacific R.R. Co.,* 115 F.3d 514 (7th Cir. 1997) and *Thacker v. St. Louis Southwestern Ry. Co.,* 257 F.3d 922 (8th Cir. 2001). The Court finds these cases readily distinguishable.

In *Monroe*, the court concluded that the plaintiff's wrongful discharge claims required interpretation of the CBA with respect to several issues relevant to the his retaliatory discharge claim, including the defendant railroad's failure to avail itself of CBA provisions prior to his discharge and the propriety of his disciplinary hearing, which was conducted pursuant to the CBA and the RLA. *Monroe*, 115 F.3d at 518. In an even more straightforward analysis in *Thacker,* the court found that the plaintiff's allegations pertained to the defendant railroad's scheduling decisions for a disciplinary hearing and that the propriety of the disciplinary hearing was a "minor dispute" involving interpretation of the CBA, subject to arbitration under the RLA. *Thacker,* 257 F.3d 923-24.

Unlike this case, the core disputes in *Monroe* and *Thacker* were governed by the CBA. Here, the resolution of plaintiff's claim does not hinge on an interpretation of the CBA. When the meaning of the CBA contract terms is not the subject of dispute, "'the bare fact that a collective-bargaining agreement will be consulted … plainly does not require the claim to be

9

extinguished.'" *Hawaiian Airlines,* 512 U.S. at 261 n.8 (quoting *Livadas v. Bradshaw,* 512 U.S. 107, 124 (1994).

The FELA provides railroad workers with substantive protection against negligent conduct that is independent of the employer's obligations under its CBA. *Buell,* 480 U.S. at 565. It also affords workers a remedy suited to their needs. *Id.* The RLA's mechanism for resolving minor disputes does not preempt causes of action to enforce rights that are independent of the CBA. *Hawaiian Airlines,* 512 U.S. at 255-56. Plaintiff is entitled to pursue a remedy under the FELA in the circumstances presented.

V

Defendant argues that plaintiff's "strict liability" claim under the HSA fails because plaintiff's duties do not fall within the HSA and therefore, the HSA does not apply. Because there are genuine issues of material fact concerning the nature of plaintiff's duties on the day of his accident, defendant is not entitled to summary judgment on this claim.

There is no dispute that a violation of the HSA constitutes negligence per se under the FELA. Thus, if plaintiff can show that defendant violated the HSA, then plaintiff need only establish causation to succeed on his claim.

The purpose of the HSA is "'to promote safety in operating trains by preventing the excessive mental and physical strain which usually results from remaining too long at an exacting task.'" *United States v. Baltimore & O.R. Co.,* 133 F.2d 831, 839 (4th Cir. 1943) (citation omitted). The Act "was passed for the protection of the public and railroad employees from the dangers inherent in long, uninterrupted periods on duty by railroad employees." *Jopek v. New York Cent. R.R. Co.,* 353 F.2d 778, 781 (3d Cir. 1965). The HSA governs the maximum number of work hours

of employees engaged in three categories of service: train employees, 49 U.S.C. § 21103; signal employees, 49 U.S.C. § 21104; and dispatching service employees, 49 U.S.C. § 21105. For example, with regard to dispatching service employees, § 21105 provides:

> **(b) General.**--Except as provided in subsection (d) of this section, a dispatching service employee may not be required or allowed to remain or go on duty for more than--
>
>> (1) a total of 9 hours during a 24-hour period in a tower, office, station, or place at which at least 2 shifts are employed; or
>>
>> (2) a total of 12 hours during a 24-hour period in a tower, office, station, or place at which only one shift is employed.
>
> **(c) Determining time on duty.**--Under subsection (b) of this section, time spent performing any other service for the railroad carrier during a 24-hour period in which the employee is on duty in a tower, office, station, or other place is time on duty in that tower, office, station, or place.
>
> **(d) Emergencies.**--When an emergency exists, a dispatching service employee may be allowed to remain or go on duty for not more than 4 additional hours during a period of 24 consecutive hours for not more than 3 days during a period of 7 consecutive days.

Defendant argues that plaintiff was not a train employee or signal employee covered by the HSA. Further, yardmasters do not, as a rule, fall within the covered service of a "dispatching service employee," and plaintiff has not shown that he performed any duties on January 4, 2004, that bring him within the coverage of the HSA.

The HSA applies to employees "actually engaged in or connected with the movement of any train." *Jopek*, 353 F.2d at 781. In *Jopek*, the court further defined this standard to encompass all those "employees who are 'actively' or 'presently' engaged in or connected with the movement of trains." *Id.* at 783. That is, "the services or duties of the employee must proximately relate to a train or trains already in motion or about to move." *Id.*

The parties dispute whether there is evidence that any duties performed by plaintiff on January 4, 2004 proximately related to a train or trains already in motion or about to move. This is a question left open on the vague record before the Court. There is no conclusive evidence that plaintiff did not perform such specific duties on the day of the accident. Contrary to defendant's argument, plaintiff's deposition testimony is sufficient to survive summary judgment on this claim.

Plaintiff testified that he "would get approximately every week on Saturdays and Sundays about a hundred cars switched . . . " (Pl. Dep. 104). When he worked in Lansing, he would "lay out the work for the switch crews," which included servicing General Motors, and expediting train traffic with regard to pick-ups and set-offs through the main corridor in Lansing (*id.* at 82). He sometimes had radio communications with crews and would "[b]asically do whatever it takes to get trains in and out" (*id.* at 82-83). His work in Lansing involved overseeing the cars that were being switched (*id.* at 84).

Plaintiff also testified during his deposition that he would "go to the computer, figure out all of the traffic that's coming from Flint, Pontiac, Detroit, what's going to be set off, figure out how it's going to be set off, where it's supposed to go" (*id*. at 105). On Sundays in particular, he would set up everything so he could turn the yard over to the dispatchers so that no one had to come in for 16 hours (*id*. at 106-07). On the afternoon of the accident, when he was preparing to leave work, he had "just had a coal train leave" and after he left, he stopped on his way home to realign a switch pursuant to directives from his supervisor (*id*. at 107, 112).

Although the parties agree that yardmasters, as a general rule, do not fall within the HSA, plaintiff's job title alone is not determinative of this issue. Rather, the duties performed at the time in question must be scrutinized to ascertain coverage or nonapplicability of the HSA. *Jopek*, 353

F.2d at 781. In *Jopek*, a welder, whose duties were to sweep and clean certain railroad switches, was found to be "actually engaged in or connected with the movement of any train" within the meaning of the HSA, where the employee was required to clean switches that were to be operated because of an approaching train. *Id.* at 780, 783.

Here, defendant argues vigorously that plaintiff's duties on January 4, 2004 did not "proximately relate to a train or trains already in motion or about to move," *Jopek*, 353 F.2d at 783, because the coal train had left the yard and there were no approaching trains for 16 hours after plaintiff aligned the switch on the afternoon of the accident. However, the Court finds the record inconclusive on this latter point given the lack of any specific evidence of the actual train schedules or movement. The Court is not persuaded that plaintiff's alignment of the switch falls short of the standards applied in *Jopek*.

Under the summary judgment standard, the evidence and all reasonable inferences must be viewed in the light most favorable to plaintiff. *See Nickels,* 560 F.3d at 429. Additionally, the courts have uniformly held that the HSA should be liberally or broadly construed. *Jopek*, 353 F.2d at 781. The Court agrees with plaintiff that the evidence, at a minimum, supports an inference that plaintiff's duties on the day of the accident proximately related to a train or trains already in motion or about to move. Accordingly, defendant is not entitled to summary judgment on plaintiff's claim of an HSA violation.

## VI

As defense counsel articulated in oral argument before the Court, this case appears to be very unusual in its factual and legal context. And while the facts may favor defendant in the ultimate outcome, defendant has presented no legal ground to reach that result on summary judgment.

For the reasons stated above, defendant's motion for summary judgment is denied. An Order consistent with this Opinion will be entered.


DATED: October 21, 2009         /s/ Janet T. Neff
                                JANET T. NEFF
                                United States District Judge